| | | |
|---|---|---|
| MARY KAY GALLAGHER, | : | CIVIL ACTION NO. **3:CV-08-2209** |
| | : | |
| Plaintiff | : | |
| | : | (Judge Caputo) |
| v. | : | |
| | : | (Magistrate Judge Blewitt) |
| MHM CORRECTIONAL SERVICES, | : | |
| | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

### I. Background.

On October 2, 2007, Plaintiff, Mary Kay Gallagher, simultaneously filed a Charge of Discrimination against Defendant MHM Correctional Services ("MHM"), with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC") alleging age and gender discrimination regarding her April 30, 2007 termination from employment. (Doc. 17, Ex. 17). On September 29, 2008, the EEOC dismissed the Charge and issued Plaintiff a Notice of Right to Sue. (*Id.*, Ex. 18).

On December 9, 2009, Plaintiff timely filed a Complaint with this Court alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.,* and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.* (Doc. 1). On February 9, 2009, Defendant filed its Answer to the Plaintiff's Complaint with affirmative defenses. (Doc. 3). Thereafter, discovery ensued. On November 9, 2009, after the

close of discovery, Defendant filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. **(Doc. 16).**

Currently pending before the Court is the Defendant's Motion for Summary Judgment with respect to all three claims of Plaintiff, *i.e.* Count I (Title VII), Count II (ADEA) and Count III (PHRA). Also, on November 9, 2007, Defendant filed its support Brief and its Statement of Material Facts ("SMF"), ¶'s 1.-44., pursuant to Local Rule 56.1 M.D. Pa. (Docs. 17 and 18). Additionally, Defendant attached Exhibits to its Brief. (Doc. 17, Exs. 1-19). Defendant filed an additional exhibit on November 10, 2009, Doc. 19, Affidavit of Wendy Flail. Plaintiff filed her Brief in Opposition to the Defendant's Motion for Summary Judgment and her Counterstatement of Material Facts on January 19, 2010. (Docs. 29 and 29-3). Plaintiff also filed her own Exhibits (Exs. A-J) with her Opposition Brief. (Doc. 30). Defendant then filed its Reply Brief in support of its Motion for Summary Judgment on February 1, 2010. (Doc. 31).

Upon request of Defendant, we heard oral argument with respect to its Motion for Summary Judgment on February 22, 2010. Defendant's Motion for Summary Judgment is now ripe for disposition.[1]

This Court has jurisdiction over this action with respect to Plaintiff's federal claims, Count I (Title VII) and Count II (ADEA), pursuant to 28 U.S.C. § 1331. *See Page v. Trustees of Univ. of Pennsylvania*, 222 Fed. Appx. 144, 145, n. 1 (3d Cir. 2007). This Court can exercise pendent jurisdiction over Plaintiff's state law claim under the PHRA (Count III) pursuant to 28 U.S.C. § 1367.

---

[1]The undersigned was assigned this case for pre-trial matters pursuant to 28 U.S.C. § 636(b)(1).

*See Slater v. Susquehanna Co.*, 613 F. Supp. 2d 653, 657 (M.D. Pa. 2009).

## II. Allegations of Complaint.

Plaintiff, a woman over the age of 50 (DOB 9-8-56), was employed by Defendant as the Director of Nursing, Administrative ("DON") at the State Correctional Institution at Frackville, Pennsylvania ("SCI-Frackville"), from September 12, 2005 through April 30, 2007, when she was terminated for allegedly using abusive and profane language on April 24, 2007, towards other employees. (Doc. 1, pp. 4-5). Plaintiff avers that she was discriminated against by Defendant due to her age and sex, and that she was really terminated based on her age and sex. Plaintiff avers that she was replaced by a male employee who was not in the protected age group and who was not qualified to hold the position as DON. (Doc. 1, p. 3). Plaintiff also alleges that she was satisfactorily performing her job with Defendant for 19 months and that in 2006 she received an excellent Performance and Development Review.

In Count I (Title VII), Plaintiff specifically alleges that her gender was a determining factor in her termination. In Count II (ADEA), Plaintiff avers that her age was a determining factor in her termination. Plaintiff alleges that she was replaced by a person who was not in the protected age group and was not in the protected gender. Plaintiff also alleges that she complained of the discriminatory conduct before her termination, but that Defendant failed to perform a proper and adequate investigation or undertake remedial action. Plaintiff testified that the charges and discipline against her by Defendant "were kind of trumped up in order to fire me," and that they were trumped up because she was a woman since Defendant had a history of doing this to other woman employees, especially women with administrative positions. (Doc. 17, Ex. 1, NT 164).

Plaintiff testified that she believes she was fired due to her gender "because [Defendant] wanted to give my position to a younger male." (*Id*., NT 166). Plaintiff also stated that the charges against her were trumped up in order to fire her due to her gender since, prior to her termination, Defendant "didn't ask if there was anything going on in my life. They didn't offer any kind of counseling, which most reasonable employers would." (*Id*., NT 164). Thus, Plaintiff alleges that Defendant unlawfully discriminated against her and terminated her based on her age and gender because she was replaced by a younger man, because Defendant failed to conduct a proper investigation prior to firing her, and because several other (6) female employees of Defendant were terminated "within a short period of time." (*Id*., NT 164-165).

In Count I, Plaintiff alleges that her termination by Defendant was due to unlawful gender discrimination in violation of Title VII. In Count II, Plaintiff alleges that her termination was due to age discrimination and was in violation of the ADEA. In addition, in Count III, Plaintiff alleges that the unlawful age and gender discrimination was in violation of the PHRA. Plaintiff avers that as a result of the alleged violations of the ADEA, Title VII and the PHRA by Defendant, she is entitled, in part, to compensatory damages, including front pay and back pay, medical rights and fringe benefits, as well as punitive damages. (Doc. 1, pp. 8-9). Plaintiff also seeks declaratory and injunctive relief as well as reinstatement to her job with Defendant.

In regards to her state law PHRA claim, Plaintiff seeks this Court to exercise its supplemental jurisdiction.[2]

---

[2]The Court can exercise supplemental jurisdiction over Plaintiff's pendent state law claim, Count III (PHRA), if her federal claims (ADEA & Title VII) are permitted to proceed. If Plaintiff's federal claims are found subject to summary judgment, this Court should not exercise

As Defendant notes (Doc. 17, p. 2, n. 2), the analysis of Plaintiff's ADEA and Title VII claims applies equally to her PHRA claim. *See Rozic v. Trinity Industries, Inc.*, 47 Fed. Appx. 151, 152, 2002 WL 31151322 , **1 (3d Cir. Pa.); *Davis v. Tammac Corp*. 127 F. Supp. 2d 625, 629, n. 6 (M.D. Pa. 2000) ("Claims brought under the PHRA are analyzed under the same standards as their federal counterparts." (Citations omitted)); *Davis v. Tammac Corp*. 127 F. Supp. 2d at 633, n. 10 ("The PHRA claim is subject to the same standards as the ADEA claim.")(Citations omitted); *Thimons v. PNC Bank, N.A.*, 254 Fed. Appx. 896, 897, n. 1 (3d Cir. 2007).

## III. Summary Judgment Standard.

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A fact is "material" if proof of its existence or non-existence could affect the outcome of the action pursuant to the governing law. *Anderson*, 477 U.S. at 248. "Facts that could alter the outcome are material facts." *Charlton v. Aramus Bd. of Educ.*, 25 F. 3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022 (1994).

---

jurisdiction over Plaintiff's pendent state claim contained in Count III of her Complaint. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130 (1966).

The burden of proving that there is no genuine issue of material fact is initially upon the movant. *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem.* 725 F.2d 667 (3d Cir. 1983). Upon such a showing, the burden shifts to the nonmoving party. *Id*. The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988). In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.*, *quoting Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied,* 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976) *cert. denied*, 429 U.S. 1038 (1977).

Under Rule 56 summary judgment must be entered where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Moreover, the Third Circuit has recently indicated that "although the party opposing summary judgment is entitled to 'the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleadings, legal memorandum or oral argument.'" *Goode v. Nash*, 2007 WL 2068365 (3d Cir. 2007)(Non-Precedential)(citation omitted).

Thus, "summary judgment is proper, when, viewing the evidence in the light most favorable to the non-movant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. General Motors*, 2009 WL 237247, *2 (3d Cir.)(citation omitted); *Page v. Trustees of Univ. of Pennsylvania*, 222 Fed. Appx. 144 at 145 (3d Cir. 2007) (the court must "view the facts in the light most favorable to the party opposing the [summary judgment] motion when making [its] determination.").

**IV. Material Facts**.

Since Defendant has submitted its SMF (Doc. 18), and since Plaintiff has responded to it (Doc. 29-3), we consider the facts stated by both parties which are properly supported by citation to evidence.

Defendant MHM had a contract with the PA DOC to operate the Mental Health Unit ("MHU") for SCI-Frackville beginning September 1, 2003. Both parties agree that Defendant ceased operations at SCI-Frackville on March 31, 2009. The DON oversaw the Defendant's nursing staff and the nursing care for inmates at SCI-Frackville. Defendant was an at-will employer and Plaintiff was an at-will employee. As a general rule, Defendant followed the principle of progressive discipline when administering discipline at SCI-Frackville.[3]

---

[3]Insofar as Plaintiff has either admitted paragraphs in Defendant's SMF or has failed to point to evidence in the record to support her denials of Defendant 's SMF, these paragraphs are accepted as undisputed.

In the case of *Barthalow v. David H. Martin Excavating, Inc.*, 2007 WL 2207897, * 1, n. 5, (M.D. Pa. 2007), this Court noted:

> The Middle District of Pennsylvania's Local Rule of Court 56.1 provides that a summary judgment motion must include a separate concise statement of material facts. M.D. Pa. Local R. 56.1. The rule also requires that an opposition to a summary judgment motion must

Further, as Whitney averred:

> Nevertheless, as a general rule, MHM followed the principle of progressive discipline when administering discipline at SCI-Frackville. When an employee behaved in a way which violated MHM standards of conduct, the employee was subject to disciplinary action, ranging from a verbal warning to termination. Intermediate steps included one or more written reprimands, a suspension, demotion or transfer. The penalty imposed depended upon both the severity of the offense and whether or not the employee had a history of performance problems.

(Doc. 17, Ex. 2, ¶ 6.).

All of Defendant's employees at SCI-Frackville, including Plaintiff, were expected to abide by the DOC's Code of Ethics.[4] (*Id.*, ¶ 7.).

With respect to ¶ 5. of Defendant's SMF, MHM employees were subject to discipline (by MHM) for violations of the standards set forth in the Code of Ethics. The penalty ranges from a verbal warning to termination, depending on the circumstances. While MHM employees, like all prison staff, had to follow the DOC's security rules, their job responsibilities and performance

---

> similarly include a statement that "responds to the numbered paragraphs set forth in [the moving party's concise statement of material facts], as to which it is contended that there exists a genuine issue to be tried." *Id.* Moreover, "[a]ll material facts set forth in [the moving party's statement] will be deemed to be admitted unless controverted by the [opposing party's statement]. " *Id.*

*See also Dusenbery v. U.S.*, 2006 WL 218220, * 1 (M.D.Pa. 2006) ("it appearing that defendants' statement of material facts was properly deemed admitted by plaintiff *see* L.R. 56.1 providing that the moving party's statement of material facts will be deemed admitted unless the non-moving party specifically contradicts the statement").

[4]Defendant submitted a copy of the DOC's Code of Ethics at Doc. 17, Ex. 3, att. Ex. 1.

standards were determined by MHM.[5]

With respect to ¶ 6. of Defendant's SMF, the success of MHM's business operations at SCI-Frackville was primarily dependent upon its relationship with and values of services provided to its client, the DOC. As set forth in its Employee Handbook, MHM's contract with the DOC was subject to unilateral termination by the client, and MHM stressed to its employees the importance of maintaining positive and effective interactions with DOC employees. All MHM employees at SCI-Frackville were expected to "deal with clients in a courteous and respectful manner" and to "communicate pleasantly and respectfully with fellow employees at all times."[6]

With respect to ¶ 7. of Defendant's SMF, MHM prohibits discrimination and harassment on the basis of an individual's age, gender, race, disability, national origin, religion, sexual orientation, family responsibility, or any other characteristic protected under the law. MHM's policy against workplace discrimination and harassment is set forth in its Employee Handbook a copy of which was distributed to all employees at SCI-Frackville. Gallagher signed a receipt acknowledging that she had read and reviewed the Handbook, including the policy against discrimination and harassment.

---

[5]Since the citation to the evidence is contained in Defendant's SMF (Doc. 18) for each of its paragraphs as required, we do not repeat the cites herein.

[6]Plaintiff denies ¶ 6. of Defendant's SMF as the opinion of Whitney, but she fails to point to any evidence to dispute Whitney's averment in his Affidavit. Doc. 17, Ex. 2, ¶ 9. Defendant MHM's Employee Handbook is at Ex. A attached to Whitney's Affidavit, Doc. 17, Ex. 2.

With respect to ¶ 8. of Defendant's SMF, Gallagher has been a registered nurse since 1991. Prior to working for MHM, Gallagher was employed as a nurse in nursing homes and long-term care facilities, and as an agency nurse, working in various locations on a temporary basis. Gallagher had limited experience working in a psychiatric setting. She spent approximately two days per week for five months working in a geri-psychiatric unit in an area hospital and three to four weeks in a new psychiatric unit at another hospital. Gallagher had no experience working in a prison setting until her employment with MHM.

Also, Plaintiff points out that she worked in a "geri-psych unit" at Shamokin Hospital for 5 months and that it was a new acute inpatient mental health unit the hospital was setting up.

With respect to ¶ 9. of Defendant's SMF, in August 2005, Gallagher interviewed for the position of Director of Nursing ("DON") for the MHU at SCI-Frackville. Gallagher met the educational and licensing requirements for the job, which included a nursing degree, state licensure as a registered nurse, and clinical nursing care experience. The licensing and educational prerequisites for the DON position are established by state law and required under MHM policy.

Plaintiff testified as follows with respect to her supervisors:

Q.      So David Mont was the person who hired you; is that right?

A.      That's correct.

Q.      How old were you when you started working for MHM?

A.      Forty-nine.

Q.      And do you know how old David Mont was?

A.      He was in his early- to mid-fifties, but I'm not sure of his exact age.

Q.    So your age or older?

A.    Yes.

Q.    And when you were working as DON, who did you report to?

A.    Dave [Mont] and Sue.

Q.    Sue Siroki?

A.    Yes.

Q.    How did that work? Were there certain issues that you reported to Dave about and certain things you addressed with Sue Siroka?

A.    Mainly it was Dave because he was the administrator. But if there were nursing concerns, things I needed to discuss nursing, I would call Sue.

(Doc. 17, Ex. 1, NT 72-73).[7]

With respect to ¶ 11. of Defendant's SMF, Gallagher was an at-will employee, a fact which she acknowledged at the time of her hire by MHM. As such, Gallagher acknowledged that she had the right to terminate her employment at any time, while MHM had the right to terminate her at any time, with or without reason.

With respect to ¶ 12. of Defendant's SMF, as DON, Gallagher was responsible for the overall management of the nursing department in the MHU, including "staffing, overseeing patient care, attendance, discipline" for the nurses and mental health workers on staff. She supervised approximately five registered nurses and several mental health workers. Mont and Gallagher attended regular administrative meetings with DOC staff to discuss treatment plans for inmates on

---

[7]Plaintiff's deposition transcript is also found at Doc. 30, Ex. A.

the MHU.

With respect to ¶ 13. of Defendant's SMF, as DON, Gallagher also had to fill in for nurses when the unit was short-staffed, sometimes working an RN shift. Gallagher testified at deposition that she carried a pager and was available "24/7" to come into work if the need arose. She recalled at least a few instances when she even came into work in the middle of the night after taking the sleeping medication, Ambient, though she did not inform any of her supervisors of this fact. Plaintiff also averred that Ambien did not interfere with her job.

With respect to ¶ 14. of Defendant's SMF, in early 2006, Mont gave notice of his resignation as MHU Program Director, but stayed in the job for a few months to assist with the transition for his replacement. Defendant's evidence reveals that on February 28, 2006, Defendant hired Ardie Kissinger to replace Mont as MHU Program Director. (Doc. 17, Ex. 2, ¶ 13. and Ex. 4, ¶ 5.). Mont's employment with Defendant ended on March 31, 2006. However, Plaintiff states that Kissinger was not hired to replace Mont, and that Mr. Furjanic told her that he wanted to see if he could get Kissinger into a Director position, but not Plaintiff's position. Plaintiff also avers that Kissinger was not hired as a Director for SCI-Frackville. (Doc. 30, Ex. J, ¶'s 62. and 63.). Also, Defendant's undisputed evidence indicates that on March 20, 2006, Kissinger's title was "Mental Health Unit Director." (Doc. 17, Ex. 13). Further, the offer letter Kissinger received from Defendant stated that his position was "Mental Health Unit Manger." (*Id.*, Ex. 4, ¶ 6. and Ex. A att. to Ex. 4). Kissinger averred that Defendant and its staff used the terms "MHU Program Director of Manger" and "MHU Administrator" interchangeably, and that he was hired for Mont's position. (*Id.*).

With respect to ¶ 15. of Defendant's SMF, the Program Director position requires a

background and license in social work, psychology, or counseling. Kissinger had a degree in psychology from Bucknell University and a Masters degree in social work from the University of Pennsylvania. He also is licensed in clinical social work by the Commonwealth of Pennsylvania. Kissinger had no experience or education as a nurse. Plaintiff states that the Program Director position Suzanne Siroki had with Defendant was not located at SCI-Frackville; rather, it was a regional position.

With respect to ¶16. of Defendant's SMF, upon Mont's departure, MHM's Pennsylvania Regional Program Director, Suzanne Siroki, changed the management model for the MHU at SCI-Frackville. Siroki gave Gallagher more administrative duties associated with running the unit and changed Gallagher's title to "DON-Administrative." Throughout her tenure with MHM, however, Gallagher continued to perform all the duties of the DON.

With respect to ¶ 17. of Defendant's SMF, as MHU Program Director, Kissinger oversaw the behavior aspects of patient treatment, counseling, and supervision of the activities therapist on staff. Kissinger also participated in personnel actions, such as discipline and performance evaluations, for the nurses and mental health workers and regularly attended administrative meetings with DOC staff. Because he had no training or experience as a nurse, Kissinger did not perform any nursing duties. At deposition, Gallagher testified that she was unsure of Kissinger's exact job duties, because Siroki hired him.

With respect to ¶ 18. of Defendant's SMF, while Gallagher was competent with respect to her nursing duties, she had difficulties handling the stress of her job and had strained relationships with DOC Corrections Officers ("CO's") who worked on the MHU. In fact, Gallagher admitted at

deposition that her job was "stressful" and that she joked about needing to take Ativan (a tranquilizer) to deal with the stress.[8]

With respect to ¶'s 19. -20. of Defendant's SMF, while MHM staff was in charge of mental health treatment of the inmates, the CO's were responsible for maintaining safety of the inmates and employees on the MHU. According to Gallagher, this created an ongoing conflict between her and the CO's about bringing inmates out of their cells for therapy and group activities.

Gallagher testified that she was "passionate" in her advocacy of inmates/patients when addressing CO's, as she described as follows:

> Q.     And when you say "passionate," you mean angry?
>
> A.     I mean, I try to advocate for the patient, and if that means raising my voice a little bit in trying to get someone to see things my way, then that's what it is. That's passionate.

Gallagher believed that the guards were angry with her because she so frequently discussed inmate issues in her "passionate" way.

Plaintiff testified as follows with respect to the ongoing conflict with the CO's about bringing inmates out of their cells for treatment:

> Q.     Was there ever an instance when any CO or other DOC employee told you what to do with respect to treatment?
>
> A.     With respect to treatment, I would say no. With being able to accomplish that treatment, I would say yes.
>
> Q.     Can you explain that?

_____

[8]While Plaintiff denies Defendant's ¶ 18. of its SMF, we do not find Plaintiff has cited to any evidence in the record to dispute Defendant's ¶ 18. However, Defendant has cited to evidence in the record to support its ¶ 18.

A.      The employee was  - - or the DOC were supposed to allow inmates yard time, once in the afternoon, once in the  - - once morning, evening.  And I was there when they [CO's] weren't taking them [inmates] out for their exercise.  And I told them [CO's] about the treatment.  And I was told they're [inmates] not going out, that's their call.  So they [CO's] told me to have the treatment in the cell rather than outside.

Q.      And what did you say, if anything, in response?

A.      I said, they [inmates] need to go outside.

Q.      And what happened?

A.      They did not go outside.

Q.      So the CO's had the ultimate authority with respect to security?

A.      Yes, because they were they ones that had to watch the inmates when they were out in the yard.

Q.      Were there any other instances where you may have wanted an inmate to come out of the cell and they did not?

A.      That was a constant struggle at Frackville with the DOC, and that was well-known within the MHM organization.  Other facilities knew of the concerns that Frackville had because we couldn't get our guys out for treatment.  It wasn't anything that was just since I was there.  It was a long ongoing problem.

        So, yes, there were issues when patients should have been allowed out for counseling, and we had to try to do it at the door, screaming through the glass, because DOC wouldn't let them out.

Q.      Did you ever get into any arguments with DOC staff about that?

A.      I get passionate.  I may have.

Q.      And when you say "passionate," you mean angry?

A.      I mean, I try to advocate for the patient, and if that means raising my voice little bit in trying to get someone to see things my way, then that's what it is.  That's passionate.

Q.      Did that work, when you got passionate about it?

A.      It depended.  There was no  - - to me, I was doing my job.  They were doing their job.  And my son, who is a CO, said, mom, the two will never meet.  It's just they're just thinking security, we're thinking treatment, and it is pretty hard to blend the two.  Frackville seems to have the hardest time doing that.

Q.      Do you know whether the CO's got angry with you because of your passionate  - -

A.      Probably.

Q.      advocacy?

A.      I would say that  - -

Q.      Let me just ask the question before you answer, because she is going to kill us both if we don't stop talking over each other.

        Do you know whether a DOC official or CO got upset with you or angry because of your passionate defense of inmates?

A.      Yes.

(Doc. 30, Ex. A, NT 81-83).

    With respect to ¶ 21. of Defendant's SMF, in fact, DOC Deputy Superintendent Michael Wenerowicz, who oversaw the MHU, counseled Gallagher at least once about her use of foul language and the negative impression she gave to prison staff.  Wenerowicz developed concerns that Gallagher was in "over her head" and could not handle the stress of her job.

    With respect to ¶ 22. of Defendant's SMF, in late January 2007, mental health worker Kim Bartos contacted MHM Regional Human Resources manager, Chuck Whitney, to complain that Gallagher referred to an inmate in an inappropriate way.  Bartos told Whitney that Gallagher had an argument with two CO's on the unit about taking an inmate out of his cell.  During the course

of that argument, Bartos overheard Gallagher refer to a mentally challenged inmate as a "fucking retard."

Plaintiff avers that she referred to the mentally challenged inmate as "freakin retarded." (Doc. 30, Ex. J, ¶ 36.).

With respect to ¶ 23. of Defendant's SMF, Gallagher admitted that in the course of "passionately" defending the inmate, she raised her voice with the guards. While she denies calling the inmate a "fucking retard," she freely admits to saying that he was "freaking retarded."

Further, Plaintiff testified as follows:

> Q.     So what happened after you learned of Kim's [Bartos] report to the DOC about you making a comment about an inmate, that he was a fucking retard? What happened after that?
>
> A.     I denied it. I just said to Chuck [Whitney], I would not call someone a fucking retard. I have a mentally challenged bother that I spent my entire life defending from people calling him a fucking retard. I was defending this inmate because he was severely MR.
>
> Q.     What does that mean?
>
> A.     Severe mental retardation, very low IQ. The DOC was talking about giving him a disciplinary  - - a write-up is what they call it, for failure to obey an order.
>
> Q.     Okay.
>
> A.     And I was passionately defending him because he couldn't understand an order.
>
> Q.     And when you say "passionately defending him," what do you mean?
>
> A.     I may have said  - - if anything, I would say he's freaking retarded. That's my terminology. I do use that type of language. But I wouldn't have called him even just plain retard.

> Q.     So you may have said he was  - -
>
> A.     He was freaking retarded.
>
> Q.     - - freaking retarded?
>
> A.     That's a diagnosis.  Whereas, a retard is a label.

(Doc. 30, Ex. A, NT 29-30).

With respect to ¶ 24. of Defendant's SMF, one of the CO's involved, James Bernadier, reported the incident to DOC Deputy Superintendent Wenerowicz.  Bernadier told Wenerowicz that Gallagher was shouting and repeatedly called the inmate a "fucking retard."  When Wenerowicz spoke with Gallagher about it, she admitted to referring to the inmate as "freaking retarded" or something to that effect.[9]

With respect to ¶ 25. of Defendant's SMF, Wenerowicz informed MHM's new Pennsylvania Regional Program Director, Jim Furjanic (who replaced Siroki), about the altercation and expressed concerns about Gallagher's lack of professionalism.[10]

With respect to ¶ 26. of Defendant's SMF, Kissinger avers as follows:

> 15.     In or about January 2007, I overheard Gallagher yelling at the CO's on duty and using the phrase "fucking retard" multiple times to refer to a mentally challenged inmate on the unit.  Mental health worker, Kim Bartos, was also present during that altercation.

---

[9] While Plaintiff denies Defendant's ¶ 24. of its SMF, we do not find Plaintiff has cited to any evidence in the record to dispute Defendant's ¶ 24.  (Doc. 29-3, ¶ 24.).  However, Defendant has cited to evidence in the record to support its ¶ 24.

[10] While Plaintiff denies Defendant's ¶ 25. of its SMF, we do not find Plaintiff has cited to any evidence in the record to dispute Defendant's ¶ 25.  (Doc. 29-3, ¶ 25.).  However, Defendant has cited to evidence in the record to support its ¶ 25.

16. Soon after that event, Gallagher and I met with Bartos to discipline her about withholding food from an inmate. I understand that after that meeting, Bartos complained to MHM Human Resources Director, Chuck Whitney, about Gallagher's "fucking retard" comment.

17. On February 7, 2007, I met with Chuck Whitney and told him that I overheard Gallagher using the phrase "fucking retard" during her argument with the CO. I also told Whitney about Gallagher's "nigger pants" remark.

(Doc. 17, Ex. 4, ¶'s 15.-17., and Doc. 17, Ex. 2, att. Ex. B).

Also, with respect to ¶ 26. of Defendant's SMF, Whitney avers as follows:

> In late January 2007, mental health worker Kim Bartos complained to me that Gallagher had referred to an inmate in an appropriate (sic) [inappropriate] way. She told me that Gallagher had an argument with two guards on the unit about taking an inmate out of his cell. During the course of that argument, Bartos overheard Gallagher refer to a mentally challenged inmate as a "fucking retard."

(Doc. 17, Ex. 2, ¶ 's 16.-17. and Ex. 2 att. Ex. B).[11]

With respect to ¶ 27. of Defendant's SMF, Whitney investigated the allegations of Gallagher's misconduct and gave his findings to Furjanic. On or about March 13, 2007, Furjanic spoke to Gallagher about her unprofessional behavior and issued her a written warning. As part of her counseling, Gallagher was required to attend a professional training session, which included sensitivity training.[12]

---

[11]While Plaintiff denies Defendant's ¶ 26. of its SMF, we do not find Plaintiff has cited to any evidence in the record to dispute Defendant's ¶ 26. (Doc. 29-3, ¶ 26.). However, Defendant has cited to evidence in the record to support its ¶ 26.

[12]While Plaintiff denies Defendant's ¶ 27. of its SMF, we do not find Plaintiff has cited to any evidence in the record to dispute Defendant's ¶ 27. (Doc. 29-3, ¶ 27.). However, Defendant has cited to evidence in the record to support its ¶ 27.

With respect to ¶ 28. of Defendant's SMF, Gallagher usually went to lunch with Kissinger and the Administrative Assistant on the MHU, Wendy Flail, in the DOC's lunchroom/locker room area. On April 24, 2007, Kissinger and Flail could not locate Gallagher on the MHU and went to lunch without her. As Gallagher admitted at deposition, she was angry that they left the unit.

With respect to ¶ 29. of Defendant's SMF, in front of several DOC employees, Gallagher stormed into the lunchroom and started yelling at Kissinger and Flail, calling them "fucking pricks" and using other profanity. Flail quickly left the room without responding, and when Kissinger told Gallagher that her behavior was inappropriate, she remarked that she could "be a prick too."[13]

With respect to ¶ 30. of Defendant 's SMF, Plaintiff testified as follows:

> Q.    So they left without you?
>
> A.    That's correct.
>
> Q.    So you were angry and got heated with them.
>
> Did you get angry with them  - - did you find them?  What happened?  Did you go to the lunchroom?
>
> A.    When I finally found them having break, yes, in the lunchroom.

(Doc. 17, Ex. 1, NT 138 -139).

Plaintiff also testified:

> Q.    So you went down and you were angry with them.  And it says, "I got heated with them."  What does that mean?

---

[13]While Plaintiff denies, in part, Defendant's ¶ 29. of its SMF, we do not find Plaintiff has cited to any evidence in the record to dispute Defendant's ¶ 29.  (Doc. 29-3, ¶ 29.).  However, Defendant has cited to evidence in the record to support its ¶ 29.  Further, Plaintiff only points out that Cescon did not aver in her Affidavit that Plaintiff used profanity.  (*See* Doc. 17, Ex. 7).

A.      I got heated with them.  I was angry.  And I think my anger was justified because I felt they abandoned me, the unit.  They didn't follow protocol.  They were taking advantage of me.  And I got angry and I raised my voice.

Q.      Did you shout?

A.      If you're considering shouting louder than yelling, no.

Q.      Did you yell?

A.      I don't know what  - - I don't know what word to use.  I was loud.  I loudly  - - I spoke loudly.

Q.      Were there other people present in the room at that time?

A.      Yes.

Q.      Were there DOC staff present in the room?

A.      Yes.

Q.      How many people do you think were there?

A.      Ten.

Q.      Were there any other MHM employees present?

A.      No, not to my knowledge.

Q.      So just you, Ardie and Wendy were there?

A.      Yes.

Q.      And you got angry and you raised your voice with them; right?

A.      Yes.

Q.      And what did you say?

A.      I was angry about the fact that they left the unit.  I mentioned that.  I said I didn't know where they were.  I don't remember exact

words.  I remember I did say, "do you feel the love?"  I did make comments about them taking longer breaks.

(*Id.*, NT 140-141).

Further, Plaintiff testified:

Q. So you were angry with them about longer lunches but maybe not that day?

A. Right.

Q. Anything else that you said to them at that time?

A. I don't remember.  I was angry.  I remember being angry, justifiably so.  I remember saying about the breaks, that they weren't going to take the long breaks anymore.  I said that I was looking for them up on the unit with my thumb up my butt.  But I don't - - I don't remember anything else that I can honestly say that I repeat - - that I could repeat.

Q. Did you lose your temper?

A. I got heated. I guess that would be losing your temper.

(*Id.*, NT 142-143).

With respect to ¶ 31. of Defendant's SMF, Gallagher acknowledged that when she is angry, she says things without thinking them through first.  Gallagher also admitted that she apologized to both Flail and Kissinger for "embarrassing them in front of other staff."

With respect to ¶ 32. of Defendant's SMF, after the April 24, 2007 incident, Kissinger immediately contacted Chuck Whitney and Jim Furjanic, and provided a written statement to Wenerowicz.  Wenerowicz spoke to Gallagher, who denied using profanity but admitted that she was publicly angry with Flail and Kissinger.  Gallagher provided a written statement to both Furjanic and Wenerowicz.

22

With respect to ¶ 33. of Defendant's SMF, Wenerowicz also informed Jim Furjanic of the incident. A few days later, Furjanic told Gallagher that she was suspended while MHM investigated the events of April 24, 2007.

With respect to ¶ 34. of Defendant's SMF, as part of his investigation, Whitney contacted SCI-Frackville Superintendent Robert Shannon about any concerns he might have about Gallagher. In response, Shannon sent an email to Whitney on May 7, 2007, stating that he had "spoken to a few staff in recent days and all are viewing the possibility of her returning as a huge mistake. I would much prefer that she be left [sic] go."[14]

With respect to ¶ 35. of Defendant's SMF, Gallagher's conduct was in violation of MHM's Code of Conduct set forth in its Employee Handbook. In particular, the company prohibits "the use of abusive or threatening language, fighting, or threatening bodily injury to fellow employees or supervisors." Her conduct also violated MHM's policy requiring that employees maintain good client relations by communicating "pleasantly and respectfully with other employees at all times."

In response to ¶ 35. of Defendant's SMF, Plaintiff points to her Affidavit in which she avers that "the reason given for my termination were pretextual." (Doc. 30, Ex. J, ¶ 8.). Plaintiff also points to the Pennsylvania Worker's Compensation Referee's June 25, 2007 Decision in which the Referee, based on the evidence before him, could not conclude "that [Plaintiff] was discharged for willful misconduct in connection with her work." (Doc. 30, Ex. E).

_____

[14]While Plaintiff denies, in part, Defendant's ¶ 34. of its SMF based on hearsay, we do not find Plaintiff has cited to any evidence in the record to dispute Defendant's ¶ 34. (Doc. 29, ¶ 34.). However, Defendant has cited to evidence in the record to support its ¶ 34.
Also, we do not find that Superintendent Shannon's personal opinion as to whether he wanted Plaintiff to return to the prison to work is hearsay.

With respect to ¶ 36. of Defendant's SMF, Plaintiff testified as follows:

> 7.    All individuals who work at the institution, whether they are subcontractors or direct employees of the Department of Corrections ("DOC") are required to read and sign a Code of Ethics which outlines the permissible behavior of all individuals working within the institution with respect to their interaction with inmates and other coworkers.

> 8.    Under the Code of Ethics, all employees are required to treat their peers, supervisors, and general public with respect and conduct themselves properly and professionally at all times.  Unacceptable conduct or insolence is not tolerated.

(Doc. 17, Ex. 3, ¶'s 7.-8.).

With respect to ¶ 37. of Defendant's SMF, about a week later [after April 24, 2007], Gallagher went to the MHM regional office to meet with Furjanic, Whitney, and Regional Vice President, George James.  Furjanic informed Gallagher that she was terminated as a result of her unprofessional conduct and because the DOC wanted her removed as DON at the facility.

With respect to ¶ 38. of Defendant's SMF, according to Gallagher, DOC supervisors and MHM staff tried to undermine her in the months prior to her termination.  She believed that DOC staff "were going around" her and addressing issues directly with Kissinger.  Because of Gallagher's "passionate" way of handling things, by 2007 many DOC employees, including the supervisors, did indeed go directly to Kissinger to discuss treatment and administrative matters.

Plaintiff denies, in part, ¶ 38., and she states that DOC employees went to Kissinger due to their preference of dealing with a male over a female and their knowledge that she was going to be terminated.

With respect to ¶ 39. of Defendant's SMF , Gallagher testified that about four to six weeks prior to her termination, Furjanic told  Gallagher he wanted to meet with Kissinger and set up a

meeting in the regional office to do so. According to Gallagher, Furjanic said he wanted to put Kissinger in a director position, "but not [hers], of course." Gallagher believes that Furjanic arranged the meeting so that he could offer Kissinger her job of "DON-Administrative" at SCI-Frackville, though she has no independent evidence to support her belief.

Plaintiff admits ¶ 39. and also states that her belief that Furjanic was going to offer Kissinger her job is substantiated by Kissinger's averment (Doc. 17, Ex.4, ¶ 6.) that he was hired for Mont's position, since she was already holding this position.

With respect to ¶ 40 of Defendant's SMF, while Kissinger did meet with Furjanic, he did not discuss Gallagher's position. Instead, at the meeting, Furjanic talked with Kissinger about taking over as MHU Program Director at SCI-Rockford, a prison located near State College, Pennsylvania.[15]

With respect to ¶ 41. of Defendant's SMF, the crux of Gallagher's age and gender discrimination claims are essentially that Kissinger, a younger man, not in the protected age group, replaced Plaintiff as the Administrative Director at SCI-Frackville. Plaintiff admits that Kissinger did not replace her as DON since he was not qualified for the DON position, and she states that Kissinger replaced her as the Administrative Director at SCI-Frackville.

With respect to ¶ 42. of Defendant's SMF, as Gallagher admitted at deposition, she was replaced in May 2007 as DON by Katherine Gillis, who is a woman older than Gallagher. As required for the position, Gillis had extensive nursing experience and was a licensed registered

---

[15]While Plaintiff simply denies Defendant's ¶ 40. of its SMF as hearsay, we do not find Plaintiff has cited to any evidence in the record to dispute Defendant's ¶ 40. However, Defendant has cited to evidence in the record to support its ¶ 40.

nurse.

With respect to ¶ 43. of Defendant's SMF, Kissinger avers as follows:

> 26.     After Gallagher's termination, I stayed in the position of MHU Program Director at SCI-Frackville.  I continued with my normal job duties and with handling the administrative duties as I had done for the previous hear.  With the approval of Furjanic, I asked Kathy Gillis, an RN on the unit, to work as acting DON.

> 27.     On or about June 1, 2007, Assistant Regional Program Director, Sandy Cherewka, and I promoted Gillis to the position of Director of Nursing on the MHU.

(Doc. 17, Ex. 4, ¶'s 26.-27.).

Plaintiff denies Kissinger's averments and states that his Affidavit is self-serving. (Doc. 29-3, ¶ 43.).

Also, with respect to ¶ 43. of Defendant's SMF, Whitney avers as follows:

> 26.     After Gallagher's termination, Kissinger remained in the position of MHU Program Director.  On or about June 1, 2007, MHM promoted Kathy Gillis, a RN on the unit, to the DON position.

(Doc. 17, Ex. 2, ¶ 26.).

With respect to ¶ 44. of Defendant's SMF, Plaintiff testified as follows:

> Q.     And did you think that was discrimination because you're a woman over 40?

> A.     At that point  - - that was part of the grounds for setting up  - - yes, I felt that was discrimination, yes, because I knew what was going to happen, I was going back to the DON and Ardie [Kissinger] would have been the director.

> Q.     And you think that's because you're a woman over the age of 40?

> A.     Well, yes, because my evaluation was excellent.  There was no  - - the charges were kind of trumped up in order to fire me. They  - - you know,

they didn't ask if there was anything going on in my life. They didn't offer any kind of counseling, which most reasonable employers would.

> Q.   Why else do you think it was because you're a woman/ Is there any other reason that makes you think that they trumped up charges  - -
>
> A.   Yes, because  - -
>
> Q.   - - because you're a woman?
>
> Let me get it out.  Is there any other reason that you think they trumped up charges or trumped up discipline because you're a woman?
>
> A.   Yes, because they have a history of doing this to other women.  It was going with their general history of terminating female employees, and not very many males in the same time.  There was Mary Kay Prezlomski.  There was Wanda Bates.  There was myself.  There was Sue Siroki.  There was Amy Criscatello, Kim Bartos, Joanne Whitecamp.  All those females within a short period of time were terminated.

(Doc. 17, Ex. 1, NT 163-165).

## V. Discussion.

Defendant has moved for summary judgment based upon Fed. R. Civ. P. 56, arguing that there is no genuine issue of material fact in dispute with respect to Plaintiff's age and gender discrimination claims under the ADEA, Title VII  and the PHRA.  Plaintiff claims that Defendant terminated her as DON-Administrative on April 30, 2007, since she was a woman over the age of 40 years.   Plaintiff claims that she was replaced by a male employee (Kissinger) who was not in the protected age group and who was not qualified to hold the position of DON-Administrative.  Defendant argues that the undisputed evidence shows that Plaintiff repeatedly acted in an unprofessional manner, that she was disciplined for her conduct, and that she was terminated due to her conduct which caused the DOC to lose confidence in her.  Plaintiff contends that the reasons

27

offered by Defendant for her termination were pretextual, and that Defendant failed to conduct a proper investigation into her alleged unprofessional behavior and failed to provide any remedial action. Plaintiff also contends that Defendant had a long history of discriminating against woman in the protected age group and that several other female employees of Defendant were terminated within a short time frame, namely, Mary K. Prezlomski, Wanda Bates, Suzanne Siroki, Amy Cristatello, Kim Bartos, and Joanne Weitkampf. (Doc. 30, Ex. A, NT 164-65).[16]

In *Duffy v. Paper Magic Group, Inc.*, 265 F. 3d 163, 167 (3d Cir. 2001), the Third Circuit set forth the following elements to establish an ADEA age discrimination claim:

> The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, term, conditions or privileges of employment on the basis of their age. *See* 29 U.S.C. § 623(a)(1). Age discrimination may be established by direct or indirect evidence. *See Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998). When evaluating ADEA discrimination claims based on indirect evidence, a plaintiff may establish a prima facie case of age discrimination under the ADEA by demonstrating that she: (1) was a member of a protected class, i.e., that she was over forty, (2) is qualified for the position, (3) suffered an adverse employment decision, (4) and was ultimately replaced by a person sufficiently younger to permit an inference of age discrimination. *See id.* at 973.

---

[16] *See Prezlomski v. MHM Services, Inc., et al.*, M.D. Pa. Civil No. 3:CV-06-1197; *Bates v. MHM Correctional Services, et al.*, M.D. Pa. Civil No. 3:CV-05-2285; and *Bartos v. MHM Services, Inc., et al.*, M.D. Pa. Civil No. 3:CV-09-1018.

In the *Prezlomski* case, Plaintiff was also represented by Attorney Loftus. On August 13, 2007, the parties in *Prezlomski* filed a Joint Stipulation of Voluntary Dismissal with Prejudice under Rule 41(a). The Court approved the Stipulation on August 20, 2007.

The *Bartos* case is still pending with this Court, and the case is still in discovery. Plaintiff's counsel is also Attorney Loftus.

In *Thimons*, 254 Fed. Appx. at 899, the Court stated:

> To establish a *prima facie* case of age discrimination, [Plaintiff ] must show that he:
> (1) was forty years old or older; (2) was terminated; (3) was qualified for the job;
> (4) and was replaced by a person sufficiently younger to provide the
> inference of discrimination. *See Showalter v. Univ. of Pittsburgh Med. Ctr.,*
> 190 F.3d 231, 234 (3d Cir.1999).

Both parties also recognize the applicable elements to establish an ADEA age discrimination claim. (Doc. 17, p. 3 and Doc. 29, p. 7).

The *Duffy* Court also noted that:

> A prima facie case creates an inference of unlawful discrimination.
> The burden of production then shifts to the employer who can dispel
> the inference by articulating a legitimate, nondiscriminatory reason for
> its actions. *See Connors*, 160 F.3d at 974 n. 2. If the employer
> meets this burden, the employee must then prove by a
> preponderance of the evidence that the articulated reasons are a
> pretext for discrimination. *See id.* Where the employee is
> unable to establish a prima facie case, however, no inference of
> discrimination is raised and the employer has no burden to proffer
> a reason for any action. *Spangle v. Valley Forge Sewer Auth.*,
> 839 F.2d 171, 174 (3d Cir. 1988).

265 F. 3d at 167.

Thus, *as the Thimons* Court, 254 Fed. Appx. at 897-98, stated:

> Claims under the ADA, ADEA, and PHRA all follow the familiar
> burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,*
> 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The
> plaintiff-employee bears the initial burden of proving a *prima facie*
> case of discrimination. *Id.* The burden then shifts to the employer to present
> a non-discriminatory reason for the adverse decision. *Id.* Once an
> employer presents a non-discriminatory reason for termination under
> the ADA, ADEA, or PHRA, the employee must "present evidence
> contradicting the core facts put forward by the employer as the legitimate
> reason for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467
> (3d Cir.2005). *See also Smith v. Davis,* 248 F.3d 249 (3d Cir.2001) (reversing
> a grant of summary judgment for an alcoholic because defendants did

not present a sufficient legitimate reason for his termination). The plaintiff's claim will not survive a summary judgment motion if he/she fails to fulfill the third step. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994).

The ADEA does not allow "age discrimination by employers against employees and applicants for employment." *EEOC v. Zippo Mfg. Co.*, 713 F. 2d 32, 35 (3d Cir. 1983) (citations omitted). Further, this Court has held that the Plaintiff must allege an actual or *de facto* employment relationship with a Defendant as a requisite to an age discrimination claim under the ADEA. *See Tyrrell v. City of Scranton*, 134 F. Supp. 2d 373, 380 (M.D. Pa. 2001). Here, Plaintiff Gallagher was undisputedly an employee of Defendant MHM. Also, Defendant was an employer as defined by the ADEA.

In *Davis v. Tammac Corp*. 127 F. Supp. 2d 625, 628-29 (M.D. Pa. 2000), this Court stated as follows:

> Discrimination claims can be established in two ways: by direct evidence that the employer's decision was motivated by discrimination; or by indirect evidence which creates an inference of discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed 2d 668 (1973). [FN6] Under the *McDonnell Douglas* burden shifting analysis, the plaintiff bears the initial burden of offering evidence sufficient to "create an inference that an employment decision was based on a discriminatory criterion illegal under the act." *Maxfield v. Sinclair International*, 766 F.2d 788, 791 (3d Cir. 1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed. 2d 773 (1986). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge. *Showalter v. University of Pittsburgh Medical Center*, 190 F.3d 231, 235 (3d Cir. 1999); *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). If the defendant satisfies this requirement, then the burden of production shifts back to the plaintiff to point to some

evidence that the reasons offered by the defendant were a pretext for discrimination. *Shaner v. Synthes*, 204 F.3d 494, 500-01 (3d Cir. 2000). To defeat summary judgment, the plaintiff must proffer evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Showalter*, 190 F.3d at 235; *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 197) (*en banc*); *Torre v. Casio, Inc.*, 42 F.3d 825, 830 (3d Cir. 1994) "To discredit the employer's proffered reason, [ ] the plaintiff cannot simply show that the employer's decisions were wrong or mistaken . . . Rather the moving plaintiff must demonstrate such weaknesses or implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact-finder could find them unworthy of credence. *Fuentes, 32 F.3d at 765; Sylvester v. Unisys Corp.*, No. Civ. A. 97-7488, 1999 W 167725, at * 4 (E.D. Pa. March 25, 1999). The trial court's function on a summary judgment motion is to determine whether plaintiff's evidence is insufficient "to permit a reasonable fact finder to conclude that the [employer's] reasons are incredible." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir.) (*en banc*), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997).

With respect to Plaintiff's Title VII claim, the Court in *Page v. Trustees of Univ. of Pennsylvania*, 222 Fed. Appx. at 145, stated:

To establish a prima facie case of Title VII sex discrimination, [Plaintiff] must show (1) that she belongs to a protected class, (2) that she suffered an adverse employment action (3) under circumstances leading to an inference of unlawful discrimination. *See Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999).

Additionally, in *Bates v. MHM Correctional Services*, 2008 WL 396225, *8 (M.D. Pa.), *aff'd* 321 Fed. Appx. 217, 2009 WL 984787 (3d Cir. 2009),[17] the Court stated:

> In order to withstand a summary judgment motion, a plaintiff suing for employment discrimination under Title VII must establish that the plaintiff's protected trait "played a role in the employer's decision making process and had a determinative influence on the outcome of that process." *Monaco v. American Gen. Assurance Co.,* 359 F.3d 296, 300 (3d Cir.2004). FN10 A plaintiff may meet this burden with either direct evidence sufficient to satisfy the requirements of Justice O'Connor's concurring opinion in *Price Waterhouse v. Hopkins,* 490 U.S. 288 (1989) or with indirect evidence sufficient to satisfy the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

The *Bates* Court further stated:

> Under *McDonnell Douglas,* the plaintiff must first make a *prima facie* showing of discrimination. *Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 352 n. 4 (3d Cir.1999). A plaintiff can establish a prima facie case by showing that: (1) she is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment despite her qualifications; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position. *Sarullo v. United States Postal Service,* 352 F.3d 789, 797 (3d Cir.2003) (citations omitted). If the plaintiff cannot establish these elements, the defendant is entitled to judgment as a matter of law. *Pivirotto,* 191 F.3d at 352 n. 4.

> When the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant and requires that it produce some evidence of a

---

[17]Bates was one of the female employees of Defendant MHM which Plaintiff Gallagher claims shows that Defendant had a long history of discriminating against woman. Defendant notes (Doc. 17, p. 7, n. 4) that our Plaintiff cannot show that any of the women who it employed and who were identified by Plaintiff to support her claim that Defendant had a history of discrimination against women by relying upon the *Bates* case since the Court granted Defendant summary judgment with respect to Bates' gender discrimination claim. We also note that Attorney Loftus, who represents Plaintiff Gallagher, represented Plaintiff in the *Bates* case.

We agree with Defendant that Plaintiff Gallagher's reliance upon the *Bates* case to support her present discrimination claims is misplaced.

> legitimate, nondiscriminatory reason for the adverse employment action. *Id.*
>
> "If the plaintiff succeeds, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge." *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 n. 2 (3d Cir.1997) (internal quotation marks and citations omitted).

*Id.* at *8-*9.

In this case, we agree with Defendant (Doc. 17, p. 3), and find that there is no direct evidence of discrimination. Thus, we must focus on the *McDonnell Douglas* burden shifting analysis. *See Glanzman v. Metropolitan Management Corp.,* 290 F. Supp. 2d 571 (E.D. Pa. 2003). Presenting indirect evidence of discrimination meets the three-step framework of *McDonnell Douglas* (where plaintiff relies on the inferences that can be drawn from the *prima facie* case). *See Fakete v. Aetna, Inc.,* 308 F.3d 335, 337-38 (3d Cir.2002). This case, as stated, is proceeding under the *McDonnell Douglas* framework, and thus is a "pretext" case.[18]

We agree with Plaintiff and disagree with Defendant, and, based upon our above detailed discussion of the material facts as well as the arguments of the parties made on February 22, 2010, we find that Plaintiff has established a *prima facie* case of discrimination by establishing that: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment decision; and (4) she was ultimately replaced by a person sufficiently younger

---

[18]In *Anderson*, the Third Circuit stated that "in employment discrimination cases, we apply the burden-shifting analysis set forth in [ *McDonnell Douglas* ]." 2009 WL 237247, *2.

33

to permit an inference of age discrimination, namely Ardie Kissinger. *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 973 (3d Cir. 1998). While the evidence, as discussed above, is disputed as to whether Kissinger replaced Plaintiff with respect to all of Plaintiff's duties or whether he merely continued with the administrative duties he was already performing and Kathy Gillis took over the clinical nursing duties of Plaintiff (Doc. 31, p. 2), we find that in viewing all the facts in the light most favorable to Plaintiff and in drawing all reasonable inferences in her favor, Plaintiff has established the fourth element of a *prima facie* case.

Therefore, for present purposes, the first element in the *McDonnell Douglas* burden-shifting framework to establish an employment discrimination claim has been met. *See Marione v. Met. Life Ins. Co.* 188 Fed. Appx. 141, 143-144 (3d Cir. 2006)(Non-Precedential). "Establishment of a *prima facie* case creates a presumption of discriminatory intent that a Defendant has the burden to rebut by setting forth some legitimate, nondiscriminatory reason for its actions." *Id.* at 144.(citation omitted).

Since Plaintiff has established a *prima facie* case of discrimination, through her evidence, she has met her burden of proof of a *prima facie* case of intentional discrimination through indirect evidence. Defendant, as it recognizes, must now provide a legitimate non-discriminatory reason for its decision to terminate Plaintiff from her DON-Administrative job in order to return the burden to the Plaintiff. We agree with Defendant (Doc. 31, pp. 2-3) and find that it has demonstrated, through its evidence which is detailed above, that it had a legitimate non-discriminatory reason to terminate Plaintiff from her position. Specifically, we agree with Defendant which states in its brief as follows:

It is undisputed that due to Gallagher's "passionate" type of patient advocacy, she routinely clashed with DOC staff about inmates on the MHU [Doc. 17, Ex. 1]. Pl. Dep. 80-83. Indeed, Gallagher does not dispute that she had a heated exchange with a guard, which led to her written warning in March 2007. *Id.* 27-34. Nor does she deny that she lost her temper and yelled at her coworkers, Kissinger and Flail, in the DOC lunchroom on April 24, 2007. *Id.* at 138-43. Moreover, there is no dispute that DOC supervisors at SCI-Frackville urged MHM to terminate Gallagher, even going so far as to state that allowing her to return would be a "huge mistake." [Doc. 17, Ex. 3]. Shannon ¶ 11; Exhibit 2 to Shannon Aff.; [Doc. 17, Ex. 3]; Whitney [Doc. 17, Ex. 2] ¶ 23; Exhibit D to Whitney Aff.

(Doc. 17, p. 8).

As the Court in *Bates v. MHM Correctional Services*, 2008 WL 396225, *9, stated:

Because a legitimate non-discriminatory reason has been presented [by Defendant], the burden of proof shifts back to the plaintiff who must present evidence that the legitimate non-discriminatory reason is merely pretext for discrimination. To meet her standard of proof plaintiff must "submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v.. Perskie,* 32 F.3d 759, 762 (3d Cir.1994).

*See also Sarullo v. U. S. Postal Service*, 352 F.3d 789, 799-800 (3d Cir. 2003).

We find that Plaintiff has failed to submit sufficient evidence that the legitimate non-discriminatory reason Defendant has presented was merely a pretext for discrimination.

Based on our above detailed discussion of the undisputed material facts of this case, we find that Plaintiff had a great deal of difficulty in maintaining professionalism with the DOC staff and with Defendant's employees who worked at SCI-Frackville. Plaintiff admitted in her deposition, as discussed above, that she clashed with the prison CO's about their refusals to allow inmates out

of their cells for treatment and for other things, and that during the clashes she was very "passionate." Plaintiff's testimony reveals that she did not get along very well with the DOC staff at SCI-Frackville. Whether Plaintiff called an inmate a "freaking retard," as she claims, or a "fucking retard," as Defendant's evidence shows, is not important; rather, the significance of this evidence is to show Plaintiff's utter lack of professionalism and her failure to maintain a good working rapport with the prison staff, which was her responsibility to do. In fact, Plaintiff was the primary contact for Defendant at SCI-Frackville and was the primary liaison with the DOC staff at this prison.

Also, whether or not Plaintiff was justified for yelling at Defendant's employees (Kissinger and Flail) on April 27, 2007, who did not wait for her to go to lunch, and whether or not Plaintiff was correct that these employees were taking too long breaks, is not the issue. The issue is that this undisputed evidence shows again that Plaintiff did not display professional behavior in front of both Defendant's staff and the DOC staff. In Flail's Affidavit, she substantiates Defendant's version of the April 24, 2007 incident, and she avers:

> 5.    Kissinger, Gallagher, and I usually ate lunch together outside of the MHU in the DOC's lunchroom/locker room area. On April 24, 2007, Kissinger and I could not locate Gallagher on the MHU, so we went to lunch without her. There were several DOC employees in the lunchroom when we got there.
>
> 6.    While we were eating, Gallagher came into the lunchroom and started yelling loudly at Kissinger and me. She appeared to be furious, saying that we left her in the unit "with her thumb up her ass," Gallagher also called us "fucking pricks" and said something like she "could be a prick, too."
>
> 7.    I was disturbed by Gallagher's outburst, and I did not say anything in response to her. I finished my food and left the lunchroom as soon as I could.

(Doc. 19).

Defendant's undisputed evidence also shows that Plaintiff was heard referring to the clothing of an African American employee of Defendant as wearing "nigger pants."

Defendant's evidence shows that Plaintiff was terminated due to her instability and due to her failure to maintain good relations with the DOC employees at SCI-Frackville. We agree with Defendant that Plaintiff only disputes the severity of her conduct and that Plaintiff only tries to justify her conduct, such as whether she used profanity during the April 24, 2007 incident and whether she called the inmate a "freaking retard," and that this is not sufficient to show Defendant's legitimate non-discriminatory reason for terminating her is unbelievable. As the *Bates* Court stated, "instead of attacking whether [Defendant] terminated her employment because of [the legitimate reason proffered by Defendant], she instead attacks the misconduct that she is alleged to have partaken in." *Bates v. MHM Correctional Services*, 2008 WL 396225, *10. "Whether or not Plaintiff actually engaged in the misconduct for which [she was terminated], however, goes to the wisdom of the dismissal, not whether it was based on legitimate grounds or not." *Id.*

We find that Plaintiff has failed to submit sufficient evidence that the legitimate non-discriminatory reason Defendant has presented was merely a pretext for discrimination. Additionally, as the *Bates* Court stated, "Defendant does not have to prove that it made the right decision or a sound decision, merely that it was a decision not based on illegitimate criteria." *Bates v. MHM Correctional Services*, 2008 WL 396225, *9. Hence, Defendant is correct that "it is not enough for Plaintiff to argue that [its] decision was wrong." (Doc. 31, p. 3).

Thus, we find that Defendant had a legitimate non-discriminatory reason for terminating Plaintiff's employment and that Plaintiff has failed to submit evidence to rebut Defendant's reason.

As Defendant asserted at oral argument, we find that Plaintiff only speculates that she was terminated by Defendant due to gender and age discrimination.[19]

Also, while Plaintiff has attempted to refute Defendant's evidence and its legitimate non-discriminatory reason for terminating her in her lengthy, 67-paragraph Affidavit, Doc. 30, Ex. J, "one can not create an issue of fact merely by submitting an affidavit denying averments in conflicting affidavits without producing any supporting evidence of the denials." *Thimons*, 254 Fed. Appx. at 899(citation omitted). Moreover, as discussed above, we find that Defendant has submitted undisputed evidence that it terminated Plaintiff due to nondiscriminatory reasons. Thus, we find that there is no genuine issue of material fact that Defendant had legitimate non-discriminatory reasons for its decision to terminate Plaintiff from her position on April 30, 2007.

Since Defendant has established non-discriminatory reasons for Plaintiff's termination, the Plaintiff must "provide evidence that would raise an inference of pretext in order to survive summary judgment." *Davis*, 127 F. Supp. 2d at 634. As the Court stated in *Glanzman v. Metropolitan Management Corp.*, 290 F. Supp. 2d 571, 578-579 (E.D. Pa. 2003), "[t]o defeat a summary judgment motion based on a Defendant's proffer of a nondiscriminatory reason, the non-moving Plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." (*citing Fuentes v. Perskie*, 32 F. 3d 759,

---

[19]"The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

765 (3d Cir. 1994)).

Plaintiff attempts to show pretext by offering evidence that she received the highest available performance review from Suzanne Siroki for September 2005 through September 2006 (Doc. 30, Ex. C), that she was awarded Pennsylvania unemployment compensation benefits since the Unemployment Compensation Referee found no evidence of willful misconduct by Plaintiff, and that Defendant had a "long history of discriminating against woman in the protected age group."

With respect to Plaintiff's first contention regarding her 2005-2006 evaluation, we agree completely with Defendant and its following argument:

> First, simply because Plaintiff received a good evaluation in mid-2006 from one supervisor, Susan Siroki, does not establish pretext for a discriminatory motive behind the decision to fire her by another supervisor, Jim Furjanic, almost a year later. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 474 (3d Cir. 2005) ("the attempt to use past positive performance reviews to show that more recent criticism was pretextual fails as a matter of law"). No one from MHM challenged Plaintiff's nursing skills or her ability to follow clinical policies; rather, it was her increasingly apparent inability in 2007 to maintain a professional demeanor, leading to the DOC's loss in confidence, that resulted in her termination.

(Doc. 31, p. 4).

Also, as Defendant points out (*Id.*, p. 5) the decision of the Pennsylvania Unemployment Compensation Referee has no determinative effect at to whether Defendant unlawfully discriminated against Plaintiff due to her age and sex with respect to Plaintiff's ADEA and Title VII claims raised in this case. *See Kirby v. J.C. Penney Corp., Inc.*, 2009 WL 3651180, *4 (W. D. Pa.) ("The decisions and determinations regarding unemployment compensation benefits are not relevant under Fed.R.Civ.P. 401 and 402 given the fact that the policies and rights embodied in the

39

Pennsylvania Unemployment Compensation Law and Title VII are distinct: the former addresses economic insecurity due to unemployment, while the latter seeks to eradicate unlawful racial discrimination in employment settings." "The unemployment compensation proceedings involved a very different burden of proof on a different issue.").

In *Long v. Valley Forge Military Academy Foundation*, 2008 WL 5157508, *14 (E. D. Pa.), the Court stated that under Pennsylvania law, findings of the Pennsylvania Unemployment Compensation Review Board do not have a preclusive effect on later civil proceedings. The *Long* Court cited to *Rue v. K-Mart Corp.*, 713 A. 2d 82, 86 (Pa. 1998), and stated:

> *Rue,* 713 A.2d at 86; *Torres v. EAFCO, Inc.,* No. 00-2846, 2001 WL 41135, at *3 (E.D.Pa. Jan.17, 2001) (noting that "the courts of Pennsylvania no longer apply the doctrines of preclusion in the unemployment compensation context"). The Pennsylvania Supreme Court has held that, [t]he substantial procedural and economic disparities between unemployment compensation proceedings and later civil proceedings negate the preclusive effect of a Referee's factual findings." *Rue,* 713 A.2d at 86. Thus, the factual findings from Plaintiff's PUCRB proceedings have no preclusive effect here. *See id.*

*Id*.

Finally, Plaintiff argues that Defendant's termination of six other female employees, namely, Mary K. Prezlomski, Wanda Bates, Suzanne Siroki, Amy Cristatello, Kim Bartos, and Joanne Weitkampf, establishes an inference that Defendant discriminated against her based on her age and her gender. We agree with Defendant (Doc. 17, pp. 6-7 and Doc. 31, p. 8) that Plaintiff has failed to prove that it had a long history of discriminating against women in the protected age group. Plaintiff testified as follows with respect to Wanda Bates, Amy Cristatello, Kim Bartos, and Joanne Weitkampf:

Q.      Is there any other reason that you think they trumped up charges or trumped up discipline because you're a woman?

A.      Yes, because they have a history of doing this to other women. It was going on with their general history of terminating female employees, and not very many males in the same time.  There was Mary Kay Prezlomski.  There was Wanda Bates.  There was myself.  There was Sue Siroki.  There was Amy Criscatello, Kim Bartos, Joanne Whitecamp. All those females within a short period of time were terminated.

Q.      Kim Bartos wasn't terminated while you were still there, was she?

A.      No.  I just said in a short period of time.

Q.      But she was terminated after you were terminated, correct?

A.      That's correct.

Q.      How about Amy Criscatello?  She doesn't even work at Frackville, right?

A.      No.  But she works for MHM and she's a female and in an administrative  - - she was in an administrative position, and she was terminated.

Q.      Do you know when she was terminated?

A.      No, I don't.

Q.      It wasn't while you were still working for MHM, was it?

A.      No.  But it was within the same year, year and a half. I'm just saying the whole time frame.

Q.      But it was after you were terminated?

A.      Yes.

Q.      And Joanne Whitecamp, was she terminated?

A.      As far as I knew, yes.

Q.      Do you know when she was terminated?

A.      No.

Q.      But you hired her, right?

A.      Yes.

Q.      And she was still working for MHM at the time of your termination?

A.      Yes.

Q.      So you believe that you were terminated because you're a woman, that they trumped up this reason to terminate you because they had a history of firing people because they're women who hadn't even been fired yet?

A.      I just looked at their general  - the question was about statistics.  And I just looked back at over the past two years.

Q.      But I'm asking yo why it is you think it's because  - - why it is you think you were fired because you're a woman.

Why do you think they would trump up charges to get rid of you because you're a woman?

A.      Because they want to give my position to a younger male, and that is not a valid reason for termination.

Q.      You never worked with Wanda Bates, did you?

A.      No.

(Doc. 30, Ex. A, NT 164-66).

However, as Defendant points out (Doc. 17, pp. 6-7), Plaintiff was hired to replace Mary Prezlomski as DON at Sci-Frackville.   (Doc. 17, Ex. 2, Whitney Affidavit at ¶ 12.).  Further, Amy Criscatello, Kim Bartos, and Joanne Weitkampf were undisputedly still employed by Defendant

when Plaintiff was terminated. (Doc. 30, Ex. A, NT 164-66).

As indicated above, Wanda Bates filed, in part, an age and race discrimination in employment action against Defendant MHM. *See Bates v. MHM Correctional Services*, 2008 WL 396225 (M.D. Pa.).[20]

As Defendant notes (Doc. 17, p. 7, n. 4), this Court in *Bates* granted both Defendant DOC's and Defendant MHM's summary judgment motions with respect to Plaintiff Bates' race discrimination claims under Title VII. This Court's decision in *Bates* was affirmed by the Third Circuit. 321 Fed. Appx. 217 (3d Cir. 2009). Further, the facts in Bates' case are not even remotely related to the facts of Plaintiff Gallagher's case. As noted, the *Prezlomski* case was dismissed with prejudice pursuant to a Rule 41(a) Stipulation, and the *Bartos* case is still in the discovery phase. In short, as Defendant argues (*Id.*, p. 7 and Doc. 31, p. 8), Plaintiff has not submitted any evidence that Mary K. Prezlomski, Wanda Bates, Amy Criscatello, Kim Bartos, and Joanne Weitkampf were terminated by MHM due to their gender, and the actions Defendant took against these women have not been shown by Plaintiff to have any relevancy to her present sex and age discrimination claims.

Further, we do not find any evidence submitted by Plaintiff to support her claim that Suzanne Siroki was an example of Defendant's alleged long history of terminating women based on their gender.

---

[20]Plaintiff Bates did not pursue her age discrimination in employment claim. *Bates v. MHM Correctional Services*, 2008 WL 396225, * 13. Nor did Plaintiff Bates assert a claim that Defendant MHM discriminated against based on her gender. *Id.* at *1.

Based on the above, we shall recommend that Defendant MHM's Summary Judgment Motion (Doc. 16) be granted with respect to both of Plaintiff's federal claims, Count I, Title VII gender discrimination claim, and Count II, ADEA age discrimination claim.

## VI. Recommendation.

Based on the above, it is respectfully recommended that the Defendant's Motion for Summary Judgment **(Doc. 16)** be granted with respect to both of Plaintiff's federal claims, Count I, Title VII gender discrimination claim, and Count II, ADEA age discrimination claim, since Plaintiff failed to present evidence that her termination from her job was a pretext for discriminatory action by Defendant. Since we recommend that Plaintiff's federal claims over which this Court has original jurisdiction (*i.e.* Title VII and ADEA claims) not be permitted to proceed to trial, we also recommend that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law PHRA claim (Count III). *See* 28 U.S.C. § 1367(c)(3); *Verdecchia v. Prozan,* 274 F.Supp.2d 712, 728 (W.D. Pa. 2003).

**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: April 23, 2010**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY KAY GALLAGHER, | : | CIVIL ACTION NO. **3:CV-08-2209** |
| | : | |
| Plaintiff | : | |
| | : | (Judge Caputo) |
| v. | : | |
| | : | (Magistrate Judge Blewitt) |
| MHM CORRECTIONAL SERVICES, | : | |
| | : | |
| Defendant | : | |

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **April 23 , 2010.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within fourteen (14)
days after being served with a copy thereof. Such party shall file
with the clerk of court, and serve on the magistrate judge and all
parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to which
objection is made and the basis for such objections. The briefing
requirements set forth in Local Rule 72.2 shall apply. A judge shall
make a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection
is made and may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the
magistrate judge, making his or her own determination on the basis

of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.


                                **s/ Thomas M. Blewitt**
_____  **THOMAS M. BLEWITT**
                                **United States Magistrate Judge**


**Dated: April 23, 2010**